UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

JANIE KINZER,                    :          No. 1:11-CV-00168
                                 :
          Plaintiff,             :
                                 :
     v.                          :          **OPINION AND ORDER**
                                 :          **DENYING DEFENDANT'S**
OFFICER RUSSELL SCHUCKMANN,      :          **MOTION FOR SUMMARY**
                                 :          **JUDGMENT**
          Defendant.             :

     This matter is before the Court on Defendant Officer
Russell Schuckmann's Motion for Summary Judgment (doc. 13),
Plaintiff Janie Kinzer's response in opposition (doc. 14), and
Defendant's reply (doc. 18).  For the reasons explained below, we
DENY Defendant's motion

## I.  Background

     The uncontested facts in this cause of action are
relatively straightforward.  A heavy rain fell on June 12, 2010 in
Green Township, Ohio (Schuckmann Dep. at 34, doc. 17).  Around
noon, Plaintiff Janie Kinzer received a phone call from Jamie
Ruggles, her son Brandon's girlfriend, who was panicked that she
and her two daughters, a seven year-old and a nine year-old, were
going to drown because the rising rain water was making its way up
her basement steps (J. Kinzer's Dep. at 24-27, doc. 15).  Mrs.
Kinzer asked Jamie if she had called 911 for help, and Jamie
replied that she had called "several times" (id. at 26).  Mrs.
Kinzer and her husband, Steven, immediately left and drove to
Jamie's home (id. at 28).  Via cell phone, Mr. Kinzer contacted 911

and learned that several calls had been made concerning the flash flood (id. at 30-31). He testified that, on the way there, his wife was "[v]ery frantic" (S. Kinzer Dep. at 32, doc. 16). When Mr. and Mrs. Kinzer arrived, the road leading to Jamie's home was "blocked from the water," so they parked their truck up the hill in a commercial parking lot (J. Kinzer Dep. at 29-30, doc. 15). Mrs. Kinzer exited the vehicle before her husband, who was busy putting on his shoes (id. at 31). She began to approach the property on foot (id.). Seeing the flood water, Mr. Kinzer then took his shoes back off and emptied his pockets (id.), apparently preparing to enter the water. Upon reaching the edge of where the water had risen on the street, Mrs. Kinzer testified that her husband, now two-to-three feet behind her, told her "[D]on't go in the water, I'll go in and get them" (id. at 32). When asked later at his deposition how he regarded her at the scene, Mr. Kinzer described her to be "just as frantic. I don't think she was out of control, but she was very worried and concerned about the safety of the kids and the pregnant mom" (S. Kinzer Dep. at 32).

Green Township Police Officer Russell Schuckmann had been dispatched to this emergency (Schuckmann Dep. at 38, doc. 17). His only knowledge upon arrival was that "there was a pregnant lady [Jamie Ruggles] with two children trapped" (id.). At this point, the parties' version of events diverge.

Mrs. Kinzer claims that Officer Schuckmann, who was standing to the left of the water, silently "reached out, took my

right wrist and twisted it, and he was just staring me in the eye, and he scared me so bad that I urinated on myself" (J. Kinzer Dep. at 32, 34-36, doc. 15). He did so right after her husband had warned her not to go in the water (id. at 34-35). Mrs. Kinzer turned to look back at her husband, and then looked forward, at which time she found herself face-to-face with Officer Schuckmann (id. at 35-36). She denied that he twisted her wrist in a manner to take it behind her back, but, rather, he "twisted it in front of me" (id. at 44). And she stated several times that Officer Schuckmann did not say a word to her (see, e.g., id. at 36). Mr. Kinzer claims to have "stepped in and actually separated the two of their hands" (S. Kinzer Dep. at 26, doc. 16). Seeing that Brandon had rescued Jamie's daughters and sat them on a grassy patch across the street, Mr. and Mrs. Kinzer went to them to "get them warm and dried off" (id. at 26-27). Brandon again waded through the flood water to rescue his girlfriend and the family pets (id. at 30, 33-34, 39-40). He also rescued Jamie's next-door neighbors, both of whom were elderly (id. at 34-35). And, with Officer Schuckmann's help, he pushed a car that had become trapped in the water, along with its elderly passenger, out of harm's way (id. at 36-38).

Approximately 45 minutes to an hour after she had arrived on scene, Mrs. Kinzer was on her cell phone talking with her daughter (J. Kinzer Dep. at 69, doc. 15). She states that an officer, who identified himself only as "the supervisor," approached her and said, "'You need to hang up your phone. We need

information from you.'" (<u>id.</u> at 68, 69).  She asked what kind of

information he needed.  In her words, the supervisor said, "I need

to have your full name, Social Security number, and I want to see

your driver's license." (<u>id.</u> at 70).  She continued to question why

he needed the information, and he replied that, if she did not

supply it, she would be arrested for disorderly conduct and taken

downtown.  She declined to give him the information until her

husband came back up the hill (<u>id.</u> at 70-72).  Mrs. Kinzer then

testified:

> And I said to Officer Schuckman[n], I said you
> twisted my wrist, and your behavior was totally
> inappropriate.  I said I've been a nurse for 29 years,
> and 22 of those I spent in psychiatry.  I'm crisis
> intervention trained, and never in my training or any
> books did I ever read that if somebody is in a crisis
> situation that you twist their wrist.  I said it was
> inappropriate.
>
> And he looked me in the eye and said I was thinking
> the same thing.

(<u>Id.</u> at 73).  Mrs. Kinzer maintains that Officer Schuckmann's

supervisor dictated to him what to write and told her that she

needed to sign the citation.  She signed it, "threw it back at

him," and said, "it's not going to be the end of it." (<u>id.</u>).  While

Mrs. Kinzer could not remember how many times she appeared in court

in connection with the citation, she recalled a first time to enter

a plea and sign a waiver of counsel (<u>id.</u> at 77-79), a second time

when her newly-hired counsel appeared on her behalf (<u>id.</u> at 79-80),

a third time when a request for discovery was made by her counsel

(<u>id.</u> at 81), a fourth time when the supervisor, but not Officer

Schuckmann, came and gave her counsel a packet of papers (<u>id.</u> at 81-82), and a fifth time, October 4, 2010, when the charge was dismissed, because, as she recalled, the judge said, "the police should have been there, that so much time had elapsed and he said no, I'm dismissing the charges" (<u>id.</u> at 82).

In contrast, Officer Schuckmann maintains that, when he arrived at the scene and exited his patrol car, Mr. Kinzer "clearly said, can you help me keep her [meaning Janie Kinzer] out of the water" (Schuckmann Dep. at 51, doc. 17). He testified further that Mrs. Kinzer was "trying to pull away from her husband" and, in order to restrain her, "[h]e was trying to hold onto her arm" (<u>id.</u> at 54). Officer Schuckmann described Plaintiff as "very frantic . . . just off the wall going, I got to save my grandbabies" (<u>id.</u> at 55). In response to Mr. Kinzer's request for help, Defendant told Plaintiff, "I said, ma'am, you're going to need to go over there," referring to a small strip mall housing a Subway restaurant (<u>id.</u> at 56). He characterized her response as "belligerent:"

> She was really out of control. I need to save my fucking grandbabies. Ma'am you need to go over there. Fuck you, I don't need to go anywhere. Ma'am, please go over there. Fuck you, I'm not going there. Ma'am, if you don't go over there, I'm going to put handcuffs on you and put you in my cruiser. Fuck you I'm not getting in my (sic) cruiser.

(<u>Id.</u> at 56-57). In all, Officer Schuckmann claims to have told Mrs. Kinzer four times to "go over there" (<u>id.</u> at 58). He then withdrew his handcuffs and grabbed her right wrist "to get compliance to handcuff her" because "I thought she was going to strike me" (<u>id.</u>

at 57). Officer Schuckmann concedes, however, that his report contained no reference to the excessive foul language which he attributes to Mrs. Kinzer or his perception that she intended to strike him (id. at 58). The incident ended when "[h]er husband was able to basically put her in a bear hug and got her out of the situation" (id.). When asked why he allowed Mr. Kinzer to pull Mrs. Kinzer away rather than arrest her, Officer Schuckmann replied, "That was the least of my concerns. She was out of the picture, I could deal with her later. I could get on the radio, prioritize the police or the fire response." (id. at 63-64).

In the process of finally issuing the citation to Mrs. Kinzer, again some 45 minutes after the incident, Officer Schuckmann denies that he ever admitted that grabbing her wrist was improper (id. at 93, 94, 98). He denies any recollection of Plaintiff complaining of an injury to her wrist, which would have required completion by him of a use-of-force report (id. at 101, 104-05). That portion of his Arrest and Investigation Report that noted "wrist pain" referred to pain in her left (not right) wrist caused by lupus, as relayed to him by his superior, Sergeant Wilhelm (id. at 86-87, 109-111). Defendant confirmed that he did not attend any of Plaintiff's court appearances with regard to the misconduct at an emergency citation he issued to Plaintiff (id. at 69, 125-126). He was on a medical leave between August and October, 2010. His return date was October 4, and, on that day at 9:15 a.m., he received a call on the township radio from Sergeant Wilhelm that he

had a court appearance in the Janie Kinzer matter scheduled for 9:00 a.m. (id. at 126). Officer Schuckmann testified that he asked his supervisor to "call down to the courthouse, tell them I'm running late" (id.). By the time he arrived, however, Defendant was told by the prosecutor that the case "already had been dismissed" (id. at 127).

Plaintiff's Complaint (doc. 1) is not pled with precision, but she seems to allege these claims for relief under 42 U.S.C. § 1983: excessive force and false arrest in violation of the Fourth and Fourteenth Amendments and violations of due process, deprivation of liberty, and false arrest contrary to the Fifth and Fourteenth Amendments. Additionally, she claims that her allegations of excessive force and violations of due process and deprivation of liberty state claims under the Ohio constitution. Finally, she pleads state common law claims for battery, false imprisonment, and malicious prosecution. Defendant Schuckmann is sued in his individual capacity only (id. ¶ 6). We note that, despite the averment scattered throughout the Complaint (¶¶ 31, 35, 40, 43), which her counsel repeated in his November 25, 2011 response in opposition to the motion at hand (doc. 14 at 2), Plaintiff apparently has not suffered "numerous personal injuries." Rather, she testified in her deposition taken August 23, 2011 that, as a result of her encounter with Officer Schuckmann, she experienced just a single physical injury, swelling and pain to her right wrist for which she sought no medical treatment (J. Kinzer Dep. at 85-86,

doc. 15).

## II.  Legal Standard

Although a grant of summary judgment is not a substitute for trial, it is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The process of evaluating a motion for summary judgment and the respective burdens it imposes upon the movant and the non-movant are well-settled. First, "a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact[.]" Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); see LaPointe v. United Autoworkers Local 600, 8 F.3d 376, 378 (6th Cir. 1993). This burden may be satisfied, however, by the movant "pointing out to the court that the [non-moving party], having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case." Barnhart v. Pickrel, Schaeffer & Ebeling Co., L.P.A., 12 F.3d 1382, 1389 (6th Cir. 1993).

Faced with such a motion, the opposing party must submit evidence in support of any material element of the claim or defense at issue in the motion on which it would bear the burden of proof at trial. Celotex, 477 U.S. at 331-32. As "the requirement [of the Rule] is that there be no genuine issue of material fact," the

Supreme Court has made clear that "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986) (emphasis in original). Ancillary factual disputes, those "that are irrelevant or unnecessary[,] will not be counted." <u>Id.</u> Furthermore, "[t]he mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." <u>Id.</u> at 252. Instead, the opposing party must present "significant probative evidence" demonstrating that "there is [more than] some metaphysical doubt as to the material facts" to survive summary judgment and proceed to trial on the merits. <u>Moore v. Philip Morris Companies, Inc.</u>, 8 F.3d 335, 339-40 (6th Cir. 1993).

At this summary judgment stage, it is not our role "to weigh the evidence and determine the truth of the matter but [rather] to determine whether there is a genuine issue for trial. <u>Anderson</u>, 477 U.S. at 249. In so doing, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [her] favor." <u>Id.</u> at 255 (citing <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144, 157-59 (1970)(citing <u>United States v. Diebold, Inc.</u>, 369 U.S. 654, 655 (1962))). Adherence to this standard, however, does not permit us to assess the credibility of witnesses. <u>See</u> <u>Adams v. Metiva</u>, 31 F.3d 375, 378 (6th Cir. 1994) (citing <u>Anderson</u>, 477 U.S. at 255)).

## III. Discussion

The Court is disappointed by the inadequate briefing of this motion. Issues of constitutional import deserve thoughtful analysis, not cursory and indiscriminate arguments. Our own research fills the disparity between the meager authority cited by the parties for general propositions of federal constitutional law and the apposite Sixth Circuit rulings necessary to inform a sound decision in the case at bar.

Defendant argues that, because he acted with probable cause in citing Plaintiff for misconduct at an emergency, "virtually all of [her] federal and state law claims" fail (doc. 13 at 4). He also asserts that he is entitled to qualified immunity and therefore protected from suit (id. at 9). Defendant urges that, because probable cause supported Plaintiff's arrest, there was no violation of a constitutional right (id.). And even if such a violation could be established, he continues that the right was not "clearly established . . . in light of the specific context of the case" (id. at 10).

Plaintiff counters that there was no probable cause (doc. 14 at 7), rendering the event a false arrest such that "any use of force is excessive and constitutes battery" (id. at 8)(emphasis added). Moreover, the act of grabbing Plaintiff's wrist and subsequently issuing her a citation amounts to two instances of false arrest and one instance (the grabbing of the wrist) of false imprisonment (id. at 8-9). Further, Plaintiff posits that any

prosecution pursued "without probable cause for the underlying arrest . . constitutes malicious prosecution" (id. at 9).

As we previously noted, Defendant Schuckmann is sued in his individual capacity only (doc. 1, Complaint ¶ 6). In Hafer v. Melo, the Supreme Court reviewed and clarified the distinction between official- and personal (or individual)-capacity suits brought under 42 U.S.C. § 1983. Official-capacity suits "'"generally represent only another way of pleading an action against an entity of which an officer is an agent."'" 502 U.S. 21, 25 (quoting Kentucky v. Graham, 473 U.S. 159, 165 (1985) (quoting Monell v. New York City Dep't of Social Services, 436 U.S. 658, 690 n.55 (1978))). Personal-capacity suits, in contrast, "seek to impose individual liability upon a government officer for actions taken under color of state law." Hafer, 502 U.S. at 25. Personal liability is established when "'the official, acting under color of state law, caused the deprivation of a federal right.'" Id. (quoting Graham, 473 U.S. at 166). Tie to a "policy or custom" need not be proved by a plaintiff, and an official sued in his personal capacity may "assert personal immunity defenses such as objectively reasonable reliance on existing law." Hafer, 502 U.S. at 25 (citing Graham, 473 U.S. at 166-67).

The doctrine of qualified immunity thus would protect Defendant Schuckmann, as a Green Township Police Officer sued in his personal (or individual) capacity, "'from liability for civil damages insofar as [his] conduct does not violate clearly

established statutory or constitutional rights of which a reasonable person would have known.'" Pearson v. Callahan, 555 U.S. 223, 231 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). Qualified immunity is "'an immunity from suit rather than a mere defense to liability.'" Id. (quoting Mitchell v. Forsyth, 472 U.S. 511, 526 (1985) (emphasis original)). Prior to the Supreme Court's decision in Pearson, a two-tiered analysis was required, beginning with this threshold question: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" Saucier v. Katz, 533 U.S. 194, 201 (2001) (citing Siegert v. Gilley, 500 U.S. 226, 232 (1991)). If the answer to that initial inquiry is negative, immunity attaches. If not, "[and] a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established." Id. Pearson ruled that following Saucier's "two-step protocol" is not mandatory, but remains permissible. 555 U.S. at 821. A lower court, in its discretion, now may consider the second question first if it believes such a path "will best facilitate the fair and efficient disposition" of the case before it. We still are at liberty, however, to follow the Saucier-prescribed sequence if we find it "worthwhile." Id.

Defendant believes our task to be an easy one, "as the parties do not have any material disputes regarding what occurred on June 12, 2010" (doc. 13 at 9 (emphasis ours)). We disagree. For

purposes of deciding this motion, we may assume only the facts to which Plaintiff, or her husband (as her witness), have testified. Anderson, 477 U.S. at 255. Thus, the scenario we evaluate is sequenced in the three paragraphs that follow.

Mrs. Kinzer received a call from a panicked Jamie Ruggles, who feared that she, along with her two daughters, were about to drown in storm water filling her basement. Mrs. Kinzer ascertained that Jamie had called 911 for help, and then she and her husband drove to Jamie's house with the purpose of trying to rescue Jamie and her children. On the drive there, Mr. Kinzer himself called 911 and verified that the authorities knew of the situation.

Upon their arrival, Mr. and Mrs. Kinzer could not access that portion of the road leading to Jamie's house because of the flood water. Mr. Kinzer parked his truck up the hill in a commercial parking lot and Mrs. Kinzer exited the vehicle before him and ran down toward Jamie's house. Mr. Kinzer testified that his wife was very frantic on the ride over and equally frantic at the scene, but he did not consider her out of control. He had emptied his pockets and taken his shoes off, and was heading toward the water, two-to-three feet behind his wife, to whom he said, "[D]on't go in the water, I'll go in and get them." At that point, Mrs. Kinzer was not yet to the edge of the water. Officer Schuckmann, however, who had been dispatched to this flash flood emergency and was aware that a pregnant woman and two children were at risk, was at the water's edge, but to the left. According to Mrs. Kinzer,

Officer Schuckmann said nothing to her,[1] but "reached out, took [her] right wrist and twisted it."[2] She saw his uniform and recognized him as a police officer. She claims to have said in response, "[Y]ou're hurting me, please let go," a plea that she testified her husband repeated. Mr. Kinzer then physically pushed Mrs. Kinzer and Officer Schuckmann apart.

About 45 minutes later, Mrs. Kinzer was issued a citation for misconduct at an emergency. Her son, Brandon, who actually went in the water and rescued his girlfriend and her family (including pets), as well as her elderly next-door neighbors, was not issued such a citation. Mrs. Kinzer, born in 1958 (J. Kinzer Dep. at 7, doc. 15), was in her early 50s at the time of the incident, and was described by Officer Schuckmann as tall and thin (Schuckmann Dep. at 31-32, doc. 17); her son Brandon was in his middle 30s (J. Kinzer Dep. at 8-9, doc. 15), and was described by Officer Schuckmann as of "medium build" (Schuckmann Dep. at 32, doc. 17).

We begin our analysis of whether Officer Schuckmann's

---

[1]This testimony precludes us from considering or crediting Officer Schuckmann's claim that he ordered Mrs. Kinzer away from the scene four times.

[2]As noted earlier, Mrs. Kinzer emphasized in her deposition testimony that Officer Schuckmann "was just staring me in the eye" and that stare "scared me so bad that I urinated on myself" (J. Kinzer Dep. at 32). The nefarious overtone that Plaintiff ascribes to Defendant's stare is irrelevant to our inquiry. "'An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional.'" Dunigan v. Noble, 390 F.3d 486, 493 (6th Cir. 2004) (quoting Graham v. Connor, 490 U.S. 386, 397 (1989)).

action of grabbing and twisting Mrs. Kinzer's wrist constitutes excessive force[3] with <u>Morrison v. Board of Trustees of Green Township</u>, 583 F.3d 394 (6th Cir. 2009).[4]  In that case, plaintiff alleged two actions on the part of the arresting officer that she believed violated her constitutional right to be free of excessive force: (1) his restraint of her by handcuffs that both she and her mother complained were too tight; and (2) his pushing her face into the ground four-to-five times to prevent her from talking after she was handcuffed and subdued.  <u>Id.</u> at 397-98.  The arresting officer raised a qualified immunity defense as to both, filing a motion for summary judgment that was denied at the district court level by Chief Judge Dlott.  <u>Id.</u> at 397.  On an interlocutory appeal, the Sixth Circuit examined plaintiff's claims in light of "the Fourth Amendment's unreasonable seizure jurisprudence," which the Court summarized as follows:

> Whether an officer has exerted excessive force during the

---

[3]Plaintiff's Complaint alleges that her claim for excessive force violates both the Fourth and Fourteenth Amendments. However, because Mrs. Kinzer "was a free person at the time of the incident and the use of force occurred in the course of an arrest or other seizure, [her] claim arises under the Fourth Amendment and its reasonableness standard." <u>Phelps v. Coy</u>, 286 F.3d 295, 299 (6th Cir. 2002) (citing <u>Graham v. Connor</u>, 490 U.S. 386, 395 (1989)).  "[T]he more generally applicable due process clause of the Fourteenth Amendment" becomes relevant only if the Fourth Amendment, or the Eighth Amendment in the case of a convicted prisoner, do not set the standard.  <u>Phelps</u>, 286 F.3d at 300 (citing <u>Darrah v. City of Oak Park</u>, 255 F.3d 301, 305-06 (6th Cir. 2001)).

[4]We note with no small amount of irony that the "Green Township" that employs Officer Schuckmann is one and the same as the named lead defendant in this case.

course of seizure is determined under an 'objective reasonableness' standard. <u>Kostrzewa v. City of Troy</u>, 247 F.3d 633, 639 (6th Cir. 2001) (citing <u>Graham v. Connor</u>, 490 U.S. 386, 396-97 (1989)). This entails 'balanc[ing] the consequences to the individual against the government's interests in effecting the seizure.' <u>Burchett v. Kiefer</u>, 310 F.3d 937, 944 (6th Cir. 2002) (citing <u>Graham</u>, 490 U.S. at 396)). The assessment involves a fact-specific inquiry based on the totality of the circumstances that 'pay[s] particular attention to "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."' <u>Kostrzewa</u>, 247 F.3d at 639 (quoting <u>Graham</u>, 490 U.S. at 396). The Court should judge the lawfulness of the conduct from the 'perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.' <u>Id.</u> (quoting <u>Graham</u>, 490 U.S. at 396).

<u>Morrison</u>, 583 F.3d at 400-01. Applying these parameters, the panel ruled that both of plaintiff's excessive force claims should survive summary judgment.

With regard to the allegation of unduly tight handcuffing, plaintiff's version of the events sufficed to create a genuine issue of material fact that: (1) she complained that the handcuffs were too tight; (2) her complaints were ignored; and (3) she experienced physical injury as a result. <u>Id.</u> at 401 (citing <u>Lyons v. City of Xenia</u>, 417 F.3d 565, 575-76 (6th Cir. 2005). The arresting officer conceded the first element, plaintiff and her mother testified as to the second,[5] and the Court was unwilling to rule as a matter of

_____

[5]At his deposition, the arresting officer denied that he ignored plaintiff's complaint, but instead responded by putting his finger in between the handcuffs and plaintiff's skin to be sure they were not "'too tight.'" <u>Morrison</u>, 583 F.3d at 402. For purposes of deciding whether defendant's claim of qualified immunity was properly denied on summary judgment, the Sixth Circuit observed that it could not credit this testimony (<u>id.</u>),

law that the pinched skin and bruising of which plaintiff complained were insufficient to establish a "physical injury" under <u>Martin v. Heideman</u>, 106 F.3d 1308 (6th Cir. 1997). <u>Morrison</u>, 583 F.3d at 402. And as to the allegation that the arresting officer repeatedly pushed plaintiff's face into the ground, plaintiff's testimony that she was screaming in pain[6] and not with the purpose to incite her family to violence against the officers, as well as that of her father, mother, and sister to the effect that her father did not behave aggressively toward the officers, sufficed to undercut the arresting officer's "justification" argument that he acted out of a concern for officer safety. <u>Id.</u> at 405-06. With no threat to officer safety at issue, inasmuch as plaintiff was handcuffed, any "'use of force after a suspect has been incapacitated or neutralized is excessive as a matter of law.'" <u>Id.</u> at 406 (quoting <u>Baker v. City of Hamilton</u>, 471 F.3d 601, 607-08 (6th Cir. 2006)). Further, even though plaintiff "described her injury as a 'minor scratch, not even deep enough to cause [the skin] to bleed,' and likened it to when 'you scratch yourself with your fingernail [and] it just kind of

---

just as this Court cannot credit the testimony of Officer Schuckmann that he ordered Mrs. Kinzer away from the scene multiple times before grabbing her wrist with the intent "to get compliance to handcuff her" (Schuckmann Dep. at 57, doc. 17).

[6]So as to avoid confusion, it should be noted that the pain to which Plaintiff Morrison referred was the result of a sprained ankle, an injury she sustained when the arresting officer tackled her. <u>Morrison</u>, 583 F.3d at 399, 405. This tackling claim, and others, were dismissed on summary judgment by the district court and that appeal was assigned to a panel separate from the one whose opinion we apply today. <u>Id.</u> at 401 n.5.

turns red'" (id. at 406 (citing A. Morrison Dep. at 116)), the Sixth
Circuit ruled that it would not "impose a blanket de minimis injury
requirement for excessive force claims." Id. at 406. "'Gratuitous
violence' inflicted upon an incapacitated detainee constitutes an
excessive use of force, even when the injuries suffered are not
substantial. Id. at 407 (citing Pigram ex rel. Pigram v. Chaudoin,
199 F. App'x 509, 513 (6th Cir. 2006)). Having discussed Morrison
at length, we now compare and apply it to the facts before us.

The statute under which Mrs. Kinzer was cited, O.R.C. §
2917.13, reads as follows:

> (A) No person shall knowingly do any of the following:
>
> (1) Hamper the lawful operations of any law enforcement
> officer . . . engaged in the person's duties at the scene
> of a . . . disaster . . . or emergency of any kind;
> . . . ;
> (3) Fail to obey the lawful order of any law enforcement
> officer engaged in the law enforcement officer's duties
> at the scene of or in connection with a . . . disaster .
> . . or emergency of any kind.

The flash flood to which Officer Schuckmann was dispatched certainly
qualifies as "the scene of a . . . disaster . . . or emergency of
any kind." Upon arrival, he knew, at a minimum, that a pregnant
woman and her two children were at risk. He observed a "very
frantic" woman, thin and in her early 50s, approach the flood water,
with her husband behind her, admonishing her not to enter the water,
but rather to let him "go in and get them." A reasonable police
officer could have assumed that Mrs. Kinzer, understandably
panicked, had every intention of wading into the water to attempt
to rescue her family members at risk; he also could have assumed

that her husband's warning had nothing to do with chivalry, but rather with a concern as to her ability to swim. Thus, a reasonable police officer would have taken steps to be sure that Mrs. Kinzer did not place herself at risk, and thus compound the emergency situation.

On a motion for summary judgment asking that we rule that Officer Schuckmann is protected by qualified immunity, we are not permitted to credit his testimony that Mrs. Kinzer's husband asked him to help subdue her, or that he ordered Mrs. Kinzer away from the scene four times before grabbing her wrist.[7] Rather, accepting

---

[7]Peppered throughout Defendant's original memorandum in support are references by counsel to lawful orders given by Officer Schuckmann cautioning Mrs. Kinzer that she needed to move away from the scene (doc. 13 at 3, 4, 6, 7, 8, 11). In his reply brief, counsel even more boldly proclaims, "As stated above[,] Officer Schuckmann gave a lawful order and warning for Janie Kinzer to leave the scene of the emergency and Steven Kinzer acknowledged that the order may have occurred. <u>The question is not if Officer Schuckmann gave the order, he did</u>. The question that the Plaintiff is attempting to confuse the issue with is whether Janie Kinzer in her 'very frantic' state heard the order, and if she did not hear the order does that effects (sic) the evaluation of Officer Schuckmann's actions" (doc. 18 at 3) (emphasis added). Clearly counsel misunderstands the summary judgment standard. Mrs. Kinzer consistently has denied that Officer Schuckmann said anything to her, including ordering her away from the scene (J. Kinzer Dep., <u>e.g.</u>, at 36). Thus, the question is, indeed, whether Officer Schuckmann gave the order, and it is a question that only a trier of fact may decide. At trial, counsel will have the opportunity to cross examine Steven Kinzer about his vacillation between outright denying that Officer Schuckmann told them not to go in the water (S. Kinzer Dep. at 59) and his concession that "it could be possible" (<u>id.</u> at 61). Counsel also will be free to argue to the jury that Mrs. Kinzer simply was too worried about the safety of her family to hear and process the words spoken to her by Officer Schuckmann. Plainly, however, these credibility issues may not be decided by us on motion.

Plaintiff's version of events, we must decide whether grabbing and twisting the wrist of middle-aged woman about to enter flash flood water, without first ordering her to stop, constitutes excessive force during the course of a seizure in violation of the Fourth Amendment.  Reluctantly, we cannot answer this question with a definitive "no," and, under the totality of circumstances, whether the right was clearly established and whether the officer acted reasonably depends on questions of fact which only a jury is privileged to resolve.  Accordingly, summary judgment is improper. Leonard v. Robinson, 477 F.3d 347, 355 (6th Cir. 2007).

Although we must deny Defendant's motion, we note that several weaknesses attend Plaintiff's claim.  Were a trier of fact to credit Officer Schuckmann's testimony that he ordered Mrs. Kinzer away from the water, giving him probable cause to make an arrest, we believe that Sixth Circuit precedent would direct that we rule, as a matter of law, that the force used to neutralize her was not excessive.  We acknowledge that Mrs. Kinzer was charged with a misdemeanor offense, seemingly less severe than a felony.  Yet the very essence of the charge--misconduct at an emergency--was enacted by the Ohio General Assembly to give law enforcement the power to exercise extraordinary control to protect the public (which would include Mrs. Kinzer and her family) and first responders (which would include, among others, Officer Schuckmann).  Accordingly, even though charged with a misdemeanor offense, we think a measure of deference likely will be owed to Officer Schuckmann's assessment

that Mrs. Kinzer was about to endanger herself and possibly the other bystanders present at the perimeter, as well as impede the rescue efforts and compromise the safety of those state actors charged with managing the emergency. See Hayden v. Green, 640 F.3d 150, 153 (6th Cir. 2011) (citing Burchett v. Kiefer, 310 F.3d 937, 944 (6th Cir. 2002)). Finally, although we have found no case precisely on point, it would seem that the force used to incapacitate Mrs. Kinzer was objectively reasonable. This case does not involve additional gratuitous violence as was the circumstance in Morrison, 583 F.3d at 407, and Pigram, 199 Fed. App'x at 513. Nor was the subduing force, a wrist grab, directed toward a "'sensitive and vitally important part of the body'" such as the head. Gorajczyk v. City of St. Clair Shores, No. 08-14764, 2010 WL 3488646, at *5 (quoting Baker, 471 F.3d at 609). On the contrary, given the spectrum of force possible, it could be perceived as the least intrusive and least likely to cause injury. Plaintiff's excessive force claim, therefore, is thin at best.

So, too, are her other claims, but we will not engage in individual analyses of them. Both parties agree that central to resolution of them all is a determination of whether probable cause supported Officer Schuckmann's actions, both restraining Plaintiff at the foot of the flood water and subsequently issuing her a citation for misconduct at an emergency. Until a jury decides which witness is credible concerning whether Officer Schuckmann ordered Mrs. Kinzer away from the scene, we cannot rule on the legal issue

of probable cause, and thus the merits of Plaintiff's constitutional, both federal and state, and common law claims, as well as whether immunity, grounded in federal case law or guaranteed by the Ohio Revised Code, attaches to Defendant's actions.

## IV. Conclusion

For the reasons set forth above, this Court hereby DENIES Defendant Officer Russell Schuckmann's Motion for Summary Judgment.

SO ORDERED.

Dated: February 7, 2012      /s/ S. Arthur Spiegel
                                      S. Arthur Spiegel
                                      United States Senior District Judge